So with that, we will get started with case number 21-60416. I'm not sure how to pronounce this, Mboba v. Garland, and Mr. Casey. Good afternoon, Your Honor. Good morning, I guess. May it please the court. My name is Brian Casey. I'm here on behalf of Petitioner Israel Mboba. Mr. Mboba was a 19-year-old pro se, non-English speaking, Congolese detainee fleeing political violence that had already killed his aunt, tortured his uncle, and subsequently caused his father to disappear when he appeared pro se at his merits hearing. His request for asylum and relief under the Convention Against Torture were denied. The BIA's affirmance of these decisions, as well as its later denial of Mr. Mboba's motion to reopen, give rise to the two petitions for review that we have before us today. These two petitions raise multiple independent and interrelated reasons that compel reversal of the BIA's decision. On its own, the first decision should be reversed because Mr. Mboba, under the totality of the circumstances, the BIA should not have reached the decisions it had reached. He was denied due process that the IJ relied on, or the BIA relied on, extensively the CFI notes that are, as a matter of law and as a matter of fact, unreliable. Counsel, let me ask you, since you just mentioned it, what's your best case, Fifth Circuit case, regarding the notes that would support your argument regarding the use of the notes? Well, Your Honor, the Fifth Circuit looks at this on a case-by-case basis. It has not, at any point, examined this particular issue, so there isn't anything that is exactly on point. Avalar-Oliva and Arlenanti are both cases that discuss, on a case-by-case basis, the use of the CFI notes, but they don't, in any way, distinguish between the argument we are trying to make, which is the summary, which is entirely consistent with his marriage testimony, and the question and answers, which form the basis for the BIA's decision. And the question and answers, it's abundantly clear, under the BIA's own precedential cases, that they're not reliable. INRI-MS and INRI-SS are two BIA cases that say, indicial reliability would be, if it was a verbatim transcript, if it was recorded, if it was read back and signed by the petitioner. None of that happened. And if you actually look at the question. Didn't he admit to some things that weren't true, like that he said his dad's sisters were his sisters? What we have to do, under Chenery and under Calcutt, we have to look at what the BIA made its decision on. The BIA made its decision on. Well, the BIA, no, it adopted what the IJ said, and it just mentioned some. It didn't say it was only looking at those two. No, the BIA adopted the rationale that it said, after I make the adverse credibility determination, I can stop. It did not go into, it did not adopt the, other than the two issues of the date on which Mr. Mboba's uncle, Pastor Mboba, was beaten, and then whether or not he was directly threatened. Those are the two. Could you point me to where it says specifically that they're only relying on those two, as opposed to using those as examples? I read it, and it seemed like the BIA was using those as examples, which is different from, we're relying only on x, y, z. Well, and it's page six and seven of the BIA's, or of the record, which is the portion of the BIA's decision. But under Chenery and under Calcutt, which the Supreme Court just decided, you have to look at what the basis for the decision. And if the- But the basis for the decision was So it's not like we're discussing something really different, like x, y, z is what we're discussing, whereas this was only lack of credibility. You're just arguing that it's only these two points. But that's not how I read it, and that's why I'm asking you to point me to where it's clear that they're only relying on this and this to support that. Well, on pages six and seven is where she goes into the, there was a discrepancy on the date when Pastor Mboba was beaten and had his leg broken, and then whether or not he was directly threatened. And those are, to my reading, those are the principal things that she relied on. And so we don't go looking at what the IJ decided, because the BIA made its own decision. And so those are the principal things that the court relied on. But to get back to your question, Judge Englehart, the CFI notes, there isn't anything inconsistent between the summary of the testimony, which is the last page of the CFI notes, and what his ultimate testimony was. And those are the things that, in prior decisions, have been looked at. And when you then look at the other portion, it's clear that that isn't verbatim. It includes stuff from the DHS's database. And so it is a question that has not been squarely presented in the Fifth Circuit, but in the First Circuit in Cuestas-Rojas, in Ferrara in the Seventh Circuit, and then there are a couple of Ninth Circuit cases. They all say that the CFI notes are, at least in some cases, not reliable. Putting the notes aside, aren't there other inconsistencies that the IJ found in his testimony that he admitted to? Well, again, under the BIA's decision, which is the decision that I think we need to focus on, was comparatively narrow and did not let you know. This is what it says. We will affirm the immigration judge's denial of relief on the basis of the adverse credibility finding, which, for the reasons stated in the immigration judge's decision, is dispositive of the respondent's claims for relief.  And I read that, Your Honor, to say, just like the IJ, I can, I, the BIA, can make an adverse credibility determination and then stop, OK? That is, so the BIA is adopting the legal rationale. It's not adopting all of the factual decisions that supported the IJ's decision. And that is wrong as a matter of law, because even if there is an adverse credibility determination, Mr. Mboba still had the chance to. OK, let me ask you this. You know, we're looking at everything. So I want to look at the CAT issue. Yes. And Convention Against Torture, CAT. Even if we were to affirm on the other grounds, what can you point us to that shows that the lack of credibility, adverse credibility, the finding on that subject wasn't enough on the CAT claim? Well, as the Fifth Circuit has said, in Abu Shagef and Arunanthi, the CAT claim requires separate analytical treatment. And that is not what happened here. She just said, I made the adverse, or sorry, I'm conflating the two different BIA decisions. The BIA said, because we made an adverse credibility determination, that's enough under CAT. That's not separately analyzing the CAT. Right. But you all presented other evidence. So even if Mboba was not believed, there was other evidence. So tell me about that. Tell us about that. Well, Your Honor, in the first instance, and actually this then highlights the importance of the petition, the motion to reopen, where there's substantially more evidence. But in the first petition, there's a letter from the uncle that stayed behind in Kinshasa, so not Pastor Mboba. There's some question about conflation of uncles, where he said, yeah, dad was deported back to the DRC and was disappeared the day he got there. And it hadn't been heard from since. Then there's extensive country condition. Yeah, that's what I want to know about. Because the IJ had found the country conditioning's just kind of generic. It's just not a great country. How does the country conditioning show that Mboba is entitled to a convention against? Well, what the country condition evidence does, and admittedly, it is less well-developed than in the motion to reopen, and that's because he was trying to do it with the help of Cameroonian detainees in detention, and he doesn't speak English. But what the country condition evidence demonstrates is that at the time, there was political unrest, and that continues to this day, Your Honor. I mean, the DRC, it's the largest civil war in the world. Six million people have been killed. Right now, there's six million people internally displaced in the country. Well, but the problem is IJ says that's kind of generic. So you still, even in a, quote, bad country, you still need, and I'm not speaking to Congo, I'm just saying, even in a bad country, whatever that may be, you still have to kind of show how that relates to you. And again, I will encourage the court to focus on the BIA's decision, which it was literally one sentence long with respect to the cat claim. And so I would say that under Effie, under Abu Shajib, and under Arul Nanthi, that is not sufficient to merit. It doesn't count as anything. So you're saying regardless of what we might think, we should send it back at least on the cat? At a minimum on the cat, and this court has done that any number of times. And then when you couple that with the motion to reopen evidence, there's ample evidence. So let me ask you about that. I'm sorry, I'm really struggling with what this issue of appointing this temporary administrative immigration judge issue is. It sounds like you're saying no one could appoint this person. It sounds like under the regs as drafted, I can't honestly see how that works. Because, which is not to say that it isn't being done, but under 1003.1A4 is the rule, is the regulation that deals with the appointment of temporary appellate immigration judges. And under that rule, it very squarely says the director in his or her discretion designates the temporary appellate immigration judge. There's no role for the attorney general. And you can tell that by looking at A1A, which is where the regs expressly give the attorney general the right to appoint regular board members. In A1A, it says the attorney general appoints board members. In A1, well, I'm blanking on it. A1A4, it says the director designates temporary appellate immigration judges. And so under a CARTI, you have to abide by your own regulations. And that's particularly in the- What's your best case on it? Because I don't think I've ever had this come up. That's why I wasn't even familiar with the TAIJ, Temporary Appellate Immigration Judge. OK, tell me what's your best case for the proposition that the attorney general did not have the authority to appoint this person who denied the motion? Because the regulation is very clear as to who has the authority, and it's the director. And then when you compare it to the preceding section, it says the attorney general appoints board members. And then it says nothing about the attorney general's role in the appointment or designation of temporary appellate immigration judges. Nothing at all. And so as a result, under a CARTI, particularly in the deportation context, the attorney general- CARTI is actually very on point. It was a situation where it was alleged that the attorney general basically usurped the power of the Board of Immigration Appeals. And the Supreme Court said, you can't do that. You have to go back and have the entity that is supposed to do that actually exercise its discretion and do it. Here we have a problem, though, and which I think is why it's clearly a violation of the DOJ's operating regulations, but I think it rises to the level of appointments clause issue. Because what you're left with is appointing an inferior officer where no one has the authority to appoint that person. Because the director doesn't. Because she, at the time, A, was invalidly appointed herself. But even if she was validly appointed, she's not a head of a department, so she can't do it. And the AG has, under their own regulations, tied their hands and said, we're not doing anything about it. It's not the AG's job to do it. So under the construct, nobody had authority to appoint a temporary appellate immigration judge. And as a result, her decision is kind of ultra-various. It's void. We have to, at a minimum, with respect to the motion to reopen, send it back to the BIA and have it been validly appointed. And we would certainly then say, on the merits, there also is a substantial problem because the temporary appellate immigration judge decided that all of that evidence was not new or previously unavailable. And the Supreme Court has defined what available is. And it's ready for use, able to be used, within reach, things like that. These are documents that didn't exist in the world to anyone, let alone a teenage detainee. Pastor Mboba's, I see them done. His x-rays didn't even exist, for example. So thank you, Your Honor. Save the rest for later. Thank you. You've reserved your time for rebuttal. Ms. Snyder? Good morning, Your Honor, as I may please the court. My name is Ilana Snyder, and I'm appearing today on behalf of the United States Attorney General. Respectfully, we're asking that the court deny this petition for review for four reasons. First, substantial evidence supports the agency's adverse credibility determination. Second, petitioner failed to exhaust his credible fear interview note argument and his due process challenges.  exercised her lawful authority over petitioner's case because she was a member of the board. She was appointed by Attorney General Merrick Garland. Fourth, and finally, the Board of Immigration Appeals did not abuse its discretion in denying petitioner's motion to reopen. So as my friend here on petitioner's side sort of pointed out, there's two petitions for review sort of bouncing around lots of issues. Well, I do want to know your point that you just made about Brown being lawfully appointed. In your response to their claim, you mainly focused on this notion that it was waived by not having been raised. If we conclude it's not waived and we need to address sort of the merits of the jurisdictional sort of argument about whether this person had the power, what is your best answer on that, why this TAIJ had the power? Sure. I think my friend here was sort of making the argument that temporary board member Brown was designated by Jean King, who at the time was the director of the Executive Office for Immigration Review. And she didn't have the authority to do that. And there was no authority for the attorney general to also appoint her. But that reads the regulations separately. That reads 1003.1A4 separately from regulation 8CFR section 1003.1. Your honors, we submit that those regulations are to be read together. And the board sort of alludes to this in its motion to reopen decision. And this I just highlight for your honors is at page 480 of the administrative record. This is note one, when the board notes that temporary appellate immigration judges sit pursuant to appointment by the attorney general and then cites to both A1 and A4. And your honors, if you look at regulation A1 and A4, they're corresponding regulations. And in fact, the initial 1988 regulation that initiated, we cited this in our brief as well. I can give you the citation. In the federal register that initiated this regulation, those regulations were one regulation. 8CFR section 1003.1A1 and A4 were together. So they're read concomitantly. Essentially, temporary board members are board members. So they're designated by the director of EOIR. And then they are appointed by the attorney general. It's two separate things. My friend here is sort of conflating the terms designated and then appointed. It's a two-step process. And this is also borne out by the timeline. Jean King appointed on, my apologies, on June 9, 2021. And then subsequently, Attorney General Merrick Garland on July 14, 2021, as we showed in the paperwork attached to our response brief, was then appointed her to her position. And so because petitioners don't sort of contend that Attorney General Merrick Garland was not lawfully the attorney general, we respectfully submit to your honors, there's no appointments clause issue here in this case, if that makes sense. So with that, I noted that there were a number of questions with respect to the adverse credibility determination. So I'd like to sort of move back and address that. It's the government's contention here that substantial evidence does support the adverse credibility determination here. Notably, as I think Judge Haynes, you pointed out, the Board of Immigration Appeals supported its and the immigration judge supported its adverse credibility determination with specific and cogent examples here. There were three specific and cogent examples. Most notably, and the- BIA relied solely on what it discussed or on the totality of what the IJ found. As your honor pointed out, the board said that it affirmed the totality of the immigration judge's decision. And I do think that the government submits that it affirmed the totality of the immigration judge's decision. So we don't just look at what they actually mentioned. Correct. That was just examples. Correct. And I do actually think this gets to another point that your honor was discussing with my friend here on petitioner's side, which is the cat claim, turning to the cat argument with respect to, this is that page, I believe, this is record page seven of the board's determination. When it discusses the cat determination, the board did a similar thing. And this is that one paragraph that petitioner's counsel was discussing. Yeah, but it says, as the respondent's claim for cat protection is based on the same set of facts as his claims for asylum and removal, withholding of removal. But that is not accurate in the sense of, you can deny asylum withholding or removal just based on adverse credibility. But on cat, if there's other evidence, that has to be looked at separately. I mean, cat is like in a separate bucket, so to speak. And I don't see where the BIA goes to that separate bucket and says, the country is just general, the thing from the uncle is not helpful, or whatever. I think it's the affirmance of the immigration judge, the rest of the sentence. We affirm the immigration judge's denial, and then citation to the immigration judge's decision at 7. And if we turn to the IJ's decision there, the IJ does discuss country conditions, evidence. Yeah, but it puts, in parentheses, affirming board's denial of convention against torture claim on the basis of the adverse credibility finding. So again, if that's all there is, if Justin Moba is all that's before the IJ, then that's fine. But when there are other country conditions, and the situation about his dad disappearing, and all of that, when those are also before the IJ, regardless of what the IJ says, the BIA has to look at that. That's our arenalpha case. Right, I mean, we submit to your honors that they did look at that. I mean, I think this paragraph makes it, it's our contention, the government submits that they did look at that. Again, this sort of poorly or inartfully worded paragraph, again, affirming the immigration judge, the citation to the immigration judge, and especially considering that this is an administrative record, page 93. The immigration judge did look at country conditions, did a thorough investigation of the country conditions, looked at, I mean, they looked at what, the immigration judge looked at the 2020, I think it was the 2020, my apologies, it might have been the 2018, the 2019 human rights report, looked at the general country conditions evidence. And as petitioner's counsel pointed out, although there has been a civil war raging in the Congo for many years, as your honor pointed out, you know, that general country conditions of civil strife are not going to rise to that sort of level of an individualized protection for CAT. So. Council, let me ask you, you haven't mentioned yet the CFI notes. And your opponent kind of led off with the discussion of the CFI notes. Yes. Do you contend, is it the government's position that those notes are indeed reliable, number one? And secondly, should we be concerned that we don't know who wrote the notes? So, it's the government's first contention that that argument has not been exhausted before the court, despite the fact that the Supreme Court in Santos-Zachariah has ruled that that is no longer a jurisdictional, with a capital J, if you will, argument. Nevertheless, it remains mandatory, and petitioner raised basically two substantially different arguments. Before the Board of Immigration Appeals, he argued, you know, the inconsistencies between my, you know, in my testimony were trivial, they were not weighty, the immigration judge weighted them incorrectly. And then before your honors is now raising the argument that, well, you know, the CFI was unreliable. Those are two completely different legal theories. And so we submit to your honors that, one, 1252-D1 is now a mandatory requirement, and petitioner was required to comply with that mandatory requirement. And two, he didn't comply with that mandatory requirement because he submitted two totally different legal theories. But if your honors are going to reach that credible fear interview argument, we first submit to your honors, as petitioner's counsel argued, that in Arvillera-Liva, that this court rejected the Second Circuit's jurisprudence on this, and all that's required is a case-by-case analysis. We also submit that there is nothing undermining the reliability of the question and answer session in this case. If your honors would permit me just one moment, I can point your honors to how we know the question and answer. And this is at page, I believe, 413 of the administrative record, and 414 of the administrative record. In page 413 of the administrative record, in the credible fear interview at 3.1, the credible fear interview notes, it's clear that the person who was conducting the credible fear interview corresponded, or if you will, what is the word I'm thinking of, referenced the credible fear Q&A, and then at 3.3, and this is at administrative record 414, and this is question 3.3, there's an actual citation here that says, typed question and answer view interview notes and a summary and analysis of the claim must be attached to this form. So it's pretty clear that the Q&A was intended and is always attached to the credible fear form. In fact, personally, I've never seen a Q&A not attached to one of these credible fear interview forms. So with respect, your honors, this is not, you know, just a credible fear interview notes, these are, this court has found them to be reliable, a reliable source, and we submit to your honors that it has exactly what this court has looked at. The asylum officer asked follow-ups of the petitioner, there was no indication that the petitioner and the asylum officer didn't understand one another, there was an interpreter in petitioner's language, which was Lingala, that was provided, there was no indication that there was any confusion between them, so with respect, we submit that the credible fear interview notes are reliable under this court's authority. I notice that I have some time left over if your honors have any further questions. Do you agree, let's assume arguendo, that we think the TAIJ person was properly appointed, do you agree that nothing was new? How can that be so? It's our contention that the evidence that petitioner submitted was not new, it was definitely not based on new facts. It's our contention that essentially, petitioner provided three pieces of crucial evidence here on his motion to reopen. First was his affidavit, the second was his uncle's affidavit, and third was his uncle's medical information. Arguably, the letter from Dr. Akhavan, which is the information regarding his potential, his suffering from post-traumatic stress disorder constituted new evidence, but again, your honors, that's something that happened after the hearing. Dr. Akhavan discussed in his affidavit that he interviewed the petitioner after July 2021, so that was afterwards. So we'd say that's new, but that's also something possibly that could not have been discovered. And again, if your honors would like to discuss the competency issue, I'm more than happy to discuss that. But with respect to those three pieces of evidence, petitioner discusses the new, could have been obtained, whether it could have been obtained, but that reads out a significant portion of the regulation. The regulation doesn't just talk about whether something can be new, it's whether the documents could have been discovered. And he focuses on whether or not, due to the fact that petitioner was detained, he had all these practical hindrances, unfortunately he was detained, he couldn't speak English, and all of these, he was pro se, all of these unfortunate circumstances, but this court has held in unpublished cases like Matadi that these practical hindrances don't rise to the level or meet that 8 CFR section 1003.2 test, because to do so would essentially give rise to a large amount of motions to reopen, and also would sort of invite, possibly incentivize individuals to file these motions to reopen after proceedings. Any other questions? Okay, thank you. Thank you. All right, we'll hear the rebuttal. I don't have too much time. Oh my goodness. Okay, you only have five minutes. We can't read that many notebooks. We've got five more hours, right? If I could talk about a couple different things quickly. It is important to, with respect to the appointment of, or designation of Judge Brown, to look at 1003.1A1, which talks about the board member shall be attorneys appointed by the Attorney General to act as the Attorney General's delegates, and then to look at section A4, which is temporary board members. Section A1 makes very clear that the AG appoints board members. There's 23 board members. As of now, there's 23 board members and five temporary appellate immigration judges, so they aren't the same thing. Number two, you wouldn't have a whole separate section devoted to temporary board members that says that the director may, in his designation, in his discretion, designate immigration judges if you had, if it was covered by A1 three sections before. So they're clearly different things. They call them different things, and the Attorney General is not mentioned at all in the temporary board members section of C4. With respect to the BIA's initial decision, the BIA did not, you know, ever once, you know, say that it was even using the totality of the circumstances test, so I wanna make sure that that's clear. That's not the analysis that the BIA engaged in, and it's nowhere in the two pages. With respect to did we raise the issue of credible fear notes, we challenged the discrepancies that were relied on by the IJ, and the waiver is a low bar here. First off, you know, there's also the Santos-Zacharia decision that says that, you know, that dramatically cuts back on the instances in which the BIA can assert waiver here. But we did raise, particularly with respect to the credible fear notes, that we challenged the inconsistencies between those notes and the hearing testimony. It is a low bar. We are only obligated to, you know, raise the issue. We can amplify it. We can change the focus of it, and that's what we did. With respect to the, whether it's new and previously unavailable, that statute, or that CFR, doesn't say whether there's new facts. It says whether there's new evidence, okay? So she said that there's no question that this is new evidence, okay? And honestly, there would be new facts. The existence of a clinical diagnosis that Mr. Mboba had PTSD is not only a new evidence, it's new facts. And to say that that was not previously unavailable the BIA isn't, well, a petitioner is not obligated to construct a, you know, deal with a metaphysical possibility of if someone was out in the real world and, you know, retained by counsel, in that instance, could they conceivably have developed this information? That's not what a regular, ordinary meaning of, is this evidence available to the detainee? And there's no question that evidence that did not exist based on, you know, appointments, medical appointments that hadn't taken place, x-rays that hadn't taken place, psychological evaluations that hadn't taken place, not only are those new facts, but it clearly is new evidence. And so we would submit that the motion to reopen, because it was based on a interpretation of new and previously unavailable that's irrational, that is, by definition, an abuse of discretion. The case that I would suggest the court take a look at is Espinal-Lagos, which was the Fifth Circuit, and it's unpublished, where the BIA said, well, the fact that you later applied for a U visa, or you had, you applied for a U visa, you should have raised the fact that your husband was beaten and the victim of a crime in the merits hearing. And because what happened is they subsequently moved to reopen based on the application for a U visa. And the Fifth Circuit said, that makes no sense. Okay, we're not obligated to. You don't have to predict the future. You don't have to predict the future. You don't have to presume stuff that might happen down the road. That's not what new and previously unavailable means. I'm out of time. If I have no more questions, thank you very much. Okay, thank you. Thank you, both sides. Case is under submission.